UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

JAMES L. GARY, Plaintiff,
*pro se,*

v.

UNITED STATES OF AMERICA,
KATHY HILL, DAN SPROUL,
C. DAVIS, J. LECLAIR,
NATHAN SIMPKINS, SHANNON
WALLACE, C.O. MR. HOWELL,
C.O. MR. COOK, DARNELL W.
MOON, UNKNOWN NAMED
OFFICERS OF THE U.S.
BUREAU OF PRISONS,
Defendants.

No. 23-768-NJR.

COMPLAINT FOR DAMAGES
JURY DEMANDED

*Jurisdiction and Venue*

1. This Court has jurisdiction over the claims herein asserted against Defendant UNITED STATES OF AMERICA because said claims are asserted under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, and this Court has subject-matter jurisdiction over such claims under 28 U.S.C. §§ 1331, 1346(b)(1).

2. This Court has federal-question jurisdiction, under § 1331, over the claims herein asserted under the Eighth Amendment against Defendants KATHY HILL, DAN SPROUL, C. DAVIS, J. LECLAIR, NATHAN SIMPKINS, SHANNON WALLACE, C.O. MR. HOWELL, C.O. MR. COOK and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS (BOP). *See, e.g., Carlson v. Green*, 446 U.S. 14, 17–18 (1980) (finding jurisdiction under § 1331 for complaint for damages for violation of prisoner's Eighth Amendment right against cruel and unusual punishment).

3. This Court has supplemental jurisdiction, under 28 U.S.C. § 1367(a), over the claims herein asserted against Defendant DARNELL W. MOON and any other colorable claims herein because they are so related to the primary claims that they form part of the same case and controversy under Article III of the U.S. Constitution.

4. Venue is proper in the Southern District of Illinois because the acts and omissions complained-of occurred therein. *See* 28 U.S.C. §§ 1391(b)(2), (e)(1)(B), 1402(b).

- PAGE 1 OF 89 -

## The Parties

5. Plaintiff JAMES L. GARY is a 48-year-old male, who, before the events in controversy, had "no known history of hearing loss, ear infections, nor family history of hearing loss." *See* OP-Otolaryngol Nursing/Ancillary Notes, Union Medical Group Audiology Terre Haute, Exh. 1.

6. Defendant UNITED STATES OF AMERICA at all relevant times owned and operated the United States Penitentiary in the municipality of Marion, Illinois (hereinafter "USP Marion").

7. Defendant KATHY HILL at all relevant times was the intelligence resource officer (IRO) in charge of USP Marion's I-unit, an administrative communications-management unit (CMU).

8. Defendant DAN SPROUL at all relevant times was the warden and chief executive of USP Marion.

9. Defendant C. DAVIS at all relevant times was the captain in charge of custody at USP Marion.

10. Defendant J. LECLAIR at all relevant times was the associate warden of custody at USP Marion.

11. Defendant NATHAN SIMPKINS at all relevant times was Plaintiff's case manager at USP Marion.

12. Defendant MR. SHANNON WALLACE at all relevant times was Plaintiff's unit manager at USP Marion.

13. Defendant C.O. MR. HOWELL at all relevant times was a correctional officer at USP Marion.

14. Defendant C.O. MR. COOK at all relevant times was a correctional officer at USP Marion.

15. Defendant DARNELL W. MOON at all relevant times was a federal prisoner, first at USP Marion's I-unit with Plaintiff, then at USP Canaan, and, subsequent to the events in controversy, he remains under the supervision of U.S. Probation.

16. Defendants UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS at all relevant times were correctional officers and other U.S. officials obliged to make rounds inside and lawfully operate USP Marion's I-unit, including its self-contained special-housing unit (SHU).

## Facts

17. Plaintiff arrived at the United States Penitentiary in Thomson, Illinois (hereinafter "USP

Thomson"), circa April 9, 2019.

18. By July 2019, Plaintiff operated a popular sports book for the other prisoners inside USP Thomson, which became well-known to the penitentiary's staffers.

19. Special Investigative Services (S.I.S.) Lieutenant Mr. J. Cruze took particular exception to Plaintiff's sports book and filed dozens of disciplinary charges against Plaintiff, accusing Plaintiff of large-scale introduction of narcotics into USP Thomson.

20. No outside criminal prosecution was ever commenced against Plaintiff and Plaintiff won the expungement of all disciplinary charges alleging criminal conduct, but never denied his operation of the sports book.

21. Unstymied, Lt. Cruze referred Plaintiff for administrative placement in the USP Marion I-unit CMU based on Plaintiff's acquitted conduct. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Notice To Inmate of Transfer To Communication Management Unit, Exh. 2 ("You have received in excess of thirty thousand dollars for the introduction of narcotics into AUSP Thomson").

22. Plaintiff arrived into SARS-CoV-2 quarantine at USP Marion circa September 18, 2020, at which time Plaintiff's notice of CMU placement was dated but not yet delivered to him. *Id.* ("Date Issued: 9-18-20").

23. Plaintiff cleared into the CMU's "general population" circa October 5, 2020.

24. Only then did Defendant KATHY HILL belatedly deliver to Plaintiff the purported reason for his CMU placement. *Id.*

25. Plaintiff, immediately upon reviewing said reason, *id.*, notified Defendant KATHY HILL that he, Plaintiff, was acquitted of the introduction of narcotics to USP Thomson.

26. Defendant KATHY HILL replied to Plaintiff to the effect that had she, Defendant KATHY HILL, been the S.I.S. lieutenant at USP Thomson, then he, Plaintiff, would not have "gotten away with it" there, and he would not "get away" with anything "here," i.e. USP Marion's I-unit CMU.

27. When Plaintiff had the aforesaid exchange with Defendant KATHY HILL, the BOP's "Counter-Terrorism Unit") ("CTU") had already approved Plaintiff's TRUst-fund Limited INmate Computer System ("TRULINCS") contact entry for his mother Ms. Vikki Gregory.

28. Discovery will confirm that after Plaintiff's aforesaid exchange with Defendant KATHY

HILL, Defendant KATHY HILL blocked Plaintiff's approved TRULINCS contact entry for his mother.

29. Plaintiff wrote to Defendant KATHY HILL: "My mother has been blocked for contact. I would like to know why? I should at least be able to contact her she is my mother and she is old and in bad health. There is no reason to have her blocked." Electronic Request to Staff ("Cop-out"), Exh. 3.

30. Discovery will confirm that Defendant KATHY HILL was she who responded to Plaintiff: "After reviewing informational sources, it was determined that inmate Gary utilized an outside contact, specifically Vicki Gregory, to effectuate a large scale drug introduction scheme at USP Thomson." *Id.*

31. Discovery will further confirm that Defendant KATHY HILL's purported "informational sources" were or principally included the same USP Thomson staffers who unsuccessfully brought and pursued the acquitted narcotics charges against Plaintiff, *e.g.*, Lieutenant Cruze and Ms. L. RohrBaugh.

32. Concurrently, almost as soon as Plaintiff cleared into the CMU's "general population," Mr. Ruben Delgado, aka *Rico*, another CMU prisoner, introduced himself to Plaintiff by inquiring if Plaintiff had smuggled drugs with him into the CMU.

33. Plaintiff told Delgado that Plaintiff had not in fact smuggled drugs into the CMU.

34. Delgado continued to try to ingratiate himself with Plaintiff and encouraged Plaintiff to try to introduce narcotics into the CMU.

35. In particular, Delgado assured Plaintiff that Delgado had had his own mother unblocked and that he, Delgado, was capable of helping Plaintiff secure the unblocking of Plaintiff's mother.

36. Unbeknownst to Plaintiff, however, Delgado was already at that time a career informant. *See, e.g., Delgado v. United States*, 2017 U.S. Dist. LEXIS 74542, Civil Action No. 1:16-89, Criminal No. B:11-716-1 (S.D. Tex. Apr. 19, 2017) at *5 (Delgado's sentence was a downward variance for "substantial assistance") (citing Cr. Dkts. 26–27); *United States v. Delgado*, 2014 U.S. Dist. LEXIS 25280, CASE NO. 1:13-CR-69(3) (E.D. Tex. Feb. 10, 2014) at *2–3 (plea agreement was entered under seal).

37. For the next four (4) months Delgado continued to urge Plaintiff and arranged for others

also to urge Plaintiff to introduce narcotics into the USP Marion I-unit CMU.

38. Circa February 2021, through other means unknown to Plaintiff, Delgado succeeded in obtaining synthetic cannabinoids (hereinafter "K2") inside the USP Marion I-unit CMU.

39. Circa March 2021 Plaintiff and Delgado were on their way from USP Marion's I-unit CMU's A-range to its program area when Defendant KATHY HILL entered I-unit through the main unit door, saw them, and hailed Delgado to speak with her.

40. Defendant KATHY HILL led Delgado into the small office customarily used for the CMU's mail call; Plaintiff remained outside the office door, awaiting Delgado.

41. Neither Defendant KATHY HILL nor Delgado closed the door to the office and Plaintiff remained in earshot of and overheard their conversation.

42. Plaintiff heard Defendant KATHY HILL tell Delgado that she had received "multiple emails," presumably from other CMU prisoners, saying that Delgado was "selling K2" and that she had "seen" multiple other prisoners bringing him, Delgado, commissary.

43. Discovery and depositions will produce and confirm that Defendant KATHY HILL did in fact receive such "multiple emails."

44. Plaintiff heard Defendant KATHY HILL tell Delgado: "You need to quit what you're doing."

45. Immediately upon his leaving the office, Delgado confirmed Plaintiff's accurate impression of Defendant KATHY HILL's statements to Delgado.

46. Shortly thereafter, Delgado further relayed Defendant KATHY HILL's statements to Delgado to numerous other USP Marion I-unit CMU prisoners. Notice is hereby given to Defendants of Plaintiff's intention to admit Defendant KATHY HILL's statements to such USP Marion I-unit CMU prisoners. See Fed. R. Evid. 807(b) (notice required for the residual exception to hearsay). See also Fed. R. Evid. 801(d)(2)(E) (admitting coconspirators' statements).

47. At this same time Delgado further advised Plaintiff that Defendant KATHY HILL was working on Delgado's behalf to lower his custody level from maximum and transfer him to a more desirable prison. Id.

48. Plaintiff further heard Defendant KATHY HILL assure Delgado at mail call that "everything" regarding his custody level and transfer were "done" and "just pending the warden's approval."

49. Circa March 26, 2021, Plaintiff learned that his daughter was missing and presumed drowned in the Cascade River in Missouri.

50. Discovery and depositions will show that the BOP's CIU advised Defendant KATHY HILL of the situation with Plaintiff's daughter and had Defendant KATHY HILL initiate the process to provide Plaintiff with an emergency phone call later that same day.

51. Plaintiff's daughter was found and pronounced dead April 5, 2021.

52. After planning for and holding the funeral on April 12, 2021, the situation continued to require Plaintiff's attention. Plaintiff's daughter was mother to four of Plaintiff's grandchildren, for whom he had to make plans, and Plaintiff's daughter also left behind modest assets to pass to Plaintiff's grandchildren, such as a car, house, furniture and a bank account.

53. Discovery and depositions will show that at all relevant times Defendant KATHY HILL was well aware of Plaintiff's duties to his family and the stress to him that any reasonable person would anticipate.

54. On Friday, April 23, 2021, Plaintiff entered quarantine elsewhere in the Marion CMU ahead of an appointment for an upper endoscopy at a local hospital. Discovery and depositions will thus confirm that Plaintiff's cell assignment was changed on April 23, 2021, from USP Marion's I-unit A-range no. 5 to B-range no. 4.

55. Discovery and depositions will also confirm that no later than 10:00 A.M. Central Time, Monday, April 26, 2021, Delgado sent an electronic cop-out to Defendant KATHY HILL signaling Defendant KATHY HILL that he, Delgado, had placed or would soon place contraband in Plaintiff's former cell, USP Marion, I-unit, A-range no. 5.

56. Plaintiff returned from his hospital trip circa 10:00 A.M. Central Time, Monday, April 26, 2021, without ever re-entering USP Marion I-unit A-range cell no. 5, to see officers searching that cell and other cells in its vicinity.

57. Defendant KATHY HILL exited Plaintiff's former cell, USP Marion I-unit A-range no. 5, and ordered an officer to place Plaintiff in the special-housing unit (SHU), aka *the hole*.

58. For approximately the next three weeks Plaintiff was able to talk with other USP Marion I-unit CMU prisoners through the open windows in the SHU leading to an outdoor area well traveled by

the USP Marion I-unit CMJ's general population.

59. Thus Plaintiff gathered the information, *infra*, ¶¶ 60–61, 66–80, 87.

60. Discovery and depositions will show that forthwith after sending Plaintiff to the hole, Defendant KATHY HILL interviewed two USP Marion I-unit CMJ prisoners, including Delgado.

61. Discovery and depositions will further show that Delgado returned from his interview and announced to the assembled prisoners of the USP Marion I-unit CMJ's A-range that Defendant KATHY HILL had given him, Delgado, an ultimatum to put the K2 in the next week where she could find it, i.e. where it would falsely implicate Plaintiff. *See also* Decl. of Samuel Whiteside, Exh. 4 ("if he [Delgado] didn't give her [Defendant KATHY HILL] the drugs or 'put it where she could fint it' within a week he [Delgado] would be sent to the SHU with [Plaintiff]"); Decl. of Howard Bloomgarden, Exh. 5 ("Delgado told me that [Defendant KATHY HILL] told him [Delgado] to produce the K2 by Friday or he was going to the SHU"); Decl. of Stephen Sherak, Exh. 6 ("Delgado mentioned that he [Delgado] spoke with [Defendant KATHY HILL] and she [Defendant KATHY HILL] told him [Delgado] that 'she knows it was him selling the K2 and if he did not produce it within a week, he would be back in the SHU as well'"). *See, again,* Fed. R. Evid. 801(d)(2)(E).

62. Shortly into Plaintiff's time in the hole Plaintiff inquired upon Correctional Officer (C.O.) Mr. Robinson as to why Plaintiff had been put in the hole.

63. Robinson stated he was unsure why Plaintiff was placed in the hole and confirmed that no contraband had been found in Plaintiff's former cell, USP Marion I-unit A-range no. 5.

64. Plaintiff soon received written notice he had been placed in the hole under investigation. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Form BP-S308.052 Administrative Detention Order, Exh. 7 ("PENDING INVESTIGATION").

65. Robinson further confirmed that Plaintiff's property had been "packed out," i.e. removed from his former cell, USP Marion I-unit A-range no. 5.

66. Discovery and depositions will confirm that Delgado sent an electronic cop-out to Defendant KATHY HILL no later than April 28, 2021, signaling Defendant KATHY HILL that he, Delgado, had placed or would soon place contraband in the light fixtures inside the light fixtures of Plaintiff's former cell, USP Marion I-unit A-range no. 5.

67. Discovery and depositions will further confirm that Defendant KATHY HILL ordered Robinson to search the lights, light fixtures and electrical receptacles in USP Marion I-unit A-range cell no. 5.

68. Discovery and depositions will further confirm that Robinson checked-out and brought tools sufficient to open the lights, light fixtures and electrical receptacles in Plaintiff's former cell and completed the search as Defendant KATHY HILL instructed, but found no contraband.

69. Discovery and depositions will further confirm that later, on the night of April 28, 2021, Delgado requested C.O. Mr. Yates to open Plaintiff's former cell, USP Marion I-unit A-range no. 5, ostensibly to retrieve books.

70. Discovery and depositions will further confirm that Yates indeed opened USP Marion I-unit A-range cell no. 5 for Delgado.

71. Circa 5:40 A.M. the next morning, April 29, 2021, discovery and depositions will confirm, the officer on duty opened every cell on Plaintiff's former cellblock, USP Marion I-unit A-range, as had been customary before Plaintiff was thrown in the hole.

72. Circa 6:15 A.M. that same day, April 29, 2021, discovery and depositions will confirm that A-range shower orderly Mr. Cesar Sayoc swept and mopped Plaintiff's former cell, USP Marion I-unit A-range no. 5, without reporting anything amiss. Unlike for Delgado, there is no basis to suspect Sayoc of cooperation or misconduct.

73. Discovery and depositions will confirm that prior to mail call on April 29, 2021, Delgado again entered Plaintiff's prior cell, USP Marion I-unit A-range no. 5, this time without Yates in tow.

74. Discovery and depositions will further confirm that Delgado placed a bed sheet over the front of USP Marion I-unit A-range cell no. 5 that obscured the views of the security cameras and potential witnesses of Delgado's actions in the cell.

75. At that time Delgado planted a prohibited substance in Plaintiff's former cell, USP Marion I-unit A-range no. 5.

76. The process took Delgado approximately 20 minutes, during which time the cell remained covered from view.

77. Discovery and depositions will confirm that circa an hour later on April 29, 2021, Delgado confirmed to Defendant KATHY HILL that he, Delgado, had planted the prohibited substance in Plaintiff's former cell, USP Marion I-unit A-range no. 5.

78. Discovery and depositions will further confirm that Defendant KATHY HILL promptly re-searched Plaintiff's former cell, USP Marion I-unit A-range no. 5, circa 1:00 P.M. Central Time, April 29, 2021, i.e. after 1) Defendant KATHY HILL's previous unproductive search of the same cell; 2) C.O. Robinson's previous unproductive search of that same cell, specifically its lights, light fixtures and eletrical receptacles; 3) Plaintiff's segregation away from that cell for the prior six days and 4) multiple other prisoners' unsupervised accesses of that cell.

79. Discovery and depositions will further confirm that Defendant KATHY HILL did not check-out any tools to use to disassemble the lights, light fixtures and electrical receptacles in Plaintiff's former cell, USP Marion I-unit A-range no. 5, on April 29, 2021.

80. Discovery and depositions will further confirm that circa 1:00 P.M. Central Time, April 29, 2021, Defendant KATHY HILL was in and out of Plaintiff's former cell, USP Marion I-unit A-range no. 5, in a matter of minutes.

81. Defendant KATHY HILL nonetheless claimed to have "discovered a piece of notebook paper wrapped in Cellophane[sic] [...] located pushed up inside the conduit pipe which runs out from the light switch box." U.S. Dep't of Justice, Fed. Bureau of Prisons, BP-A0288 Incident Report 3499434 at § 11, Exh. 8.

82. Defendant KATHY HILL then claimed the paper tested positive for narcotic drugs. *Id.*

83. Defendant KATHY HILL charged Plaintiff with "POSSESSION OF DRUGS." *Id.* at § 10.

84. Defendant KATHY HILL, in the charging document, averred that Plaintiff "was the only in-mate assigned to" USP Marion I-unit A-range cell no. 5. *Id.* at § 11.

85. But Defendant KATHY HILL knew or should have known that Plaintiff was not, in fact, as-signed to USP Marion I-unit A-range cell no. 5 when Defendant KATHY HILL thus averred and that Plaintiff had neither been there nor been assigned there for six days, ever since Plaintiff had entered quarantine for his endoscopy hospital trip on April 23, 2021.

86. The next day, April 30, 2021, S.I.S. Lieutenant Ms. K. Mitchell delivered to Plaintiff a

preliminary version of the charging document.

87. Discovery and depositions will show that Mitchell also advised Plaintiff that the BOP had suspended the disciplinary process against him pending referral for his criminal prosecution.

88. Discovery and depositions will further confirm that Defendants KATHY HILL and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS presented or knowingly caused to be presented to prosecutorial decisionmakers information and evidence that the Defendants knew or should have known was false and misleading, e.g., that Plaintiff was the only prisoner assigned to USP Marion I-unit A-range cell no. 5 when Defendant KATHY HILL claimed to have found drugs therein, when, in fact, Plaintiff had not been assigned to that cell for days. See, e.g., U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 1350.01 Criminal Matter Referrals (Jan. 11, 1996) (criminal referrals are tracked).

89. Discovery and depositions will further confirm that Defendants KATHY HILL and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS concurrently withheld or caused to be withheld from prosecutorial decisionmakers information and evidence that the Defendants knew or should have known was material and exculpatory, e.g., that by the time Defendant KATHY HILL claimed to have found the drugs in USP Marion I-unit A-range cell no. 5, Plaintiff's property had been removed therefrom, both Defendant KATHY HILL and Robinson had each searched that cell unproductively, other prisoners had unsupervised access to that cell between the unproductive searches and the supposedly productive search and Delgado's correspondence and conversations with Defendant KATHY HILL regarding Delgado's—not Plaintiff's—placement of the drugs in that cell. Id.

90. Discovery and depositions will further confirm that had Defendants KATHY HILL and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS succeeded in securing a false criminal conviction against Plaintiff, the Defendants would have used said conviction to secure a sentence reduction for Delgado. See Fed. R. Crim. P. 35(b) (allowing sentence reductions for "substantial assistance" prosecuting others).

91. Immediately upon Mitchell's advising Plaintiff of the criminal referral Plaintiff requested that Mitchell preserve the April 28–29, 2021, surveillance footage from USP Marion I-unit A-range.

92. Discovery and depositions will confirm that at this time Plaintiff's situation with his deceased daughter remained unresolved and deeply troubled Plaintiff, and that Defendants KATHY HILL and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS knew or should have known of Plaintiff's vulnerability because, e.g., they had been monitoring Plaintiff's calls to his family on the same topic. See U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5214.02 Communications Management Unit (hereinafter "CMU P.S.") at ch. 5(c)(2)(b) (Apr. 1, 2015) (quoting 28 C.F.R. § 540.204(b) ("Unmonitored telephone communication is limited to privileged communication with the inmate's attorney")).

93. When Mitchell advised Plaintiff of the criminal referral Plaintiff inquired with Mitchell as to whether Plaintiff would continue to receive his phone calls to his family.

94. Mitchell left the hole and shortly returned.

95. Mitchell, upon her return, reported to Plaintiff that she, Mitchell, had checked with Defendant KATHY HILL, and that Defendant KATHY HILL had ordered that Plaintiff be prohibited all but a single call per month.

96. Discovery and depositions will confirm that Defendant KATHY HILL wrote no specific restriction against Plaintiff's calls and Plaintiff had been afforded no hearing whatsoever. Contrast CMU P.S. at ch. 5(c)(2)(a) ("Unless specifically restricted, inmates will be allowed two 15-minute monitored telephone calls per week"). See, also, id. at ch. 5 (expressly overriding "all Bureau of Prisons policies and national directives" where "specifically provided differently in this policy").

97. Despite Defendants' efforts, prosecution was declined circa May 11, 2021, at which time the BOP resumed its disciplinary process against Plaintiff and delivered to Plaintiff the first numbered version of Defendant KATHY HILL's charging document. See Incident Report 3499434 at Part II—Committee Action ("5-11-21 11:46A"), Exh. 8.

98. Still no hearing had been held, but Defendants immediately moved Plaintiff from administrative segregation to, effectively, disciplinary housing.

99. Plaintiff immediately felt the sweltering heat that plagues the section of the hole to which he had just been moved.

100. Defendants UNITED STATES OF AMERICA, KATHY HILL, DAN SPROUL, C. DAVIS, J. LECLAIR, NATHAN SIMPKINS, SHANNON WALLACE, C.O. MR. COOK and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS each knew or should have known of the sweltering-heat problem in that section of the hole through each's regular weekly rounds through that section of the hole, which will be confirmed through discovery and depositions.

101. Plaintiff further noticed a large group of spiders nesting just outside his cell door, where he could not proactively exterminate them, but they could easily enter his cell through the bars at any time, including when he slept.

102. The same Defendants, supra, ¶ 100, separated Plaintiff from his property, e.g., his legal files, commissary, address book, postage stamps, personal photographs, radio, watch, shoes, etc., and refused to deliver to Plaintiff his periodicals. Contrast U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5270.11 Special Housing Units at ch. 12(h)(3) (Nov. 23, 2016) (prisoners allowed three magazines, a newspaper, 25 photographs, shoes, radio, headphones and watch in administrative segregation).

103. The same Defendants deprived Plaintiff of nearly all contact with the outside and when they did allow Plaintiff his once-monthly 15-minute phone call, Plaintiff's mother remained blocked.

104. Plaintiff, however, was initially able to continue to communicate with other CMU prisoners through the open windows.

105. Discovery and depositions will confirm that Delgado informed Defendant KATHY HILL that Plaintiff was gathering statements and other information implicating Delgado and Defendant KATHY HILL in falsely initiating criminal referrals and prison discipline against Plaintiff. See, e.g., 18 U.S.C. §§ 371 (general conspiracy is punishable by up to five years in prison), 1001(a) (knowing, willful, falsification or cover-up of material facts to U.S. agencies is punishable by up to 5 years imprisonment), 1519 (falsification of federal records is punishable by up to 20 years imprisonment).

106. Discovery depositions will further confirm that upon Defendant KATHY HILL's learning of Plaintiff's information gathering, Defendant KATHY HILL went to the warden, Defendant DAN SPROUL,

for a directive to close the windows in the hole.

107. Discovery and depositions will further confirm that Defendant DAN SPROUL issued the directive as Defendant KATHY HILL had requested.

108. Discovery and depositions will further confirm that Defendant KATHY HILL ordered Defendant NATHAN SIMPKINS to close the windows in the hole.

109. Discovery and depositions will further confirm that Defendant NATHAN SIMPKINS, aware of the sweltering heat, contacted Defendant DAN SPROUL to confirm Defendant DAN SPROUL's directive to close the windows and advise Defendant DAN SPROUL of the heat problem.

110. Discovery and depositions will further confirm that Defendant DAN SRPOUL confirmed the directive to Defendant NATHAN SIMPKINS despite the heat problem.

111. Defendant NATHAN SIMPKINS went to the hole and closed the windows as Defendants KATHY HILL and DAN SPROUL had directed.

112. While in the hole closing the windows, Defendant NATHAN SIMPKINS advised Plaintiff of the above events regarding Defendant KATHY HILL's origination of the directive to close the windows, that he, Defendant NATHAN SIMPKINS, had personally contacted Defendant DAN SRPOUL with his concern about the heat, but that Defendant DAN SPROUL let stand Defendant DAN SPROUL's directive to close the windows.

113. Defendant NATHAN SIMPKINS additionally advised Plaintiff that Defendants KATH HILL's and DAN SPROUL's purported reason for the directive to close the windows was to stop Plaintiff's communications with the other USP Marion I-unit CMU prisoners.

114. Circa that same time, Defendant KATHY HILL's disciplinary charge against Plaintiff was heard by the unit disciplinary committee (UDC). *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 5270.09 Inmate Discipline Program (hereinafter "Disc. P.S.") at ch. 4 (July 8, 2011) (quoting 28 C.F.R. § 541.7 Unit Discipline Committee (UDC) review of the incident report).

115. Plaintiff presented to the UDC his witness list, witness statements, Plaintiff's own statement and Plaintiff's requests for a staff representative and the surviellance footage, and Plaintiff denied culpability.

116. The UDC referred the charge to a disciplinary-hearing officer (DHO). *See* Disc. P.S. at ch. 4 (quoting 28 C.F.R. § 541.7(a)(4) ("If you are charged with a Greatest or High severity prohibited act... the UDC will automatically refer the incident report to the DHO")).

117. Discovery and depositions will confirm that, separately, Plaintiff and the other prisoners in the hole, Mohamed Rashed Daoud Al-'Owhali, Donald Ray Morgan, Shawn Christy and Tarek Mehanna, each complained about the sweltering heat on multiple occasions to Defendants DAN SPROUL, custody captain C. DAVIS, associate warden of custody J. LECLAIR, Case Manager Nathan Simpkins and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS.

118. Meanwhile Plaintiff remained able, ableit with some difficulty, to communicate with the other USP Marion I-unit CMU prisoners by shouting through the closed windows.

119. Discovery and depositions will confirm that Delgado notified Defendant KATHY HILL of Plaintiff's continued communications and information gathering, adverse to Delgado and Defendants.

120. Thereafter, on June 4, 2021, Defendant C.O. MR. HOWELL entered the hole, rolling behind him a yellow commercial fan roughly four feet wide and two and a half feet deep, on a two-foot-high rolling stand.

121. The fan was literally labeled and branded: "BIG ASS FAN."

122. Discovery and depositions will confirm that Defendant C.O. MR. HOWELL gratuitously announced to Plaintiff *et al.*—as if by doing so Defendant C.O. MR. HOWELL believed he would absolve himself of responsibility—that Defendant KATHY HILL had directed that he, Defendant C.O. MR. HOWELL, place the "BIG ASS FAN" in front of Plaintiff's cell and turn it on its highest power setting.

123. Discovery and depositions will further confirm that the unusual nature of the situation was manifest to all who saw it, *e.g.*, C.O. Mr. Miller had followed Defendant C.O. MR. HOWELL to the hole and advised Plaintiff *et al.* that the "BIG ASS FAN" had cost $4,500-$5,000.

124. Discovery and depositions will further confirm that while Defendant C.O. MR. HOWELL set up the "BIG ASS FAN," C.O. Mr. Miller told Plaintiff to the effect that the Defendants "hate you."

125. Discovery and depositions will further confirm that just about every other staffer who commented on the situation to Plaintiff *et al.* echoed Miller's sentiment about the malicious mo-

tive behind the "BIG ASS FAN" and its placement in the hole directly outside Plaintiff's cell.

126. The noise from the "BIG ASS FAN" was deafening when Defendant C.O. MR. HOWELL placed it outside Plaintiff's cell and turned it on its highest power setting; Plaintiff, himself accustomed to operating an M1A2 Abrams tank equipped with a jet-turbine engine in the U.S. Army, albeit with adequate hearing protection, likens the noise from the "BIG ASS FAN" to standing directly behind an M1A2 tank without hearing protection.

127. Immediately Plaintiff *et al.* tried to complain about the deafening noise to Defendant C.O. MR. HOWELL, but he promptly walked out of the hole.

128. Plaintiff promptly asked for hearing protection when he was able to do so, but never did Defendants provide Plaintiff with any hearing protection of any kind.

129. Discovery and depositions will confirm that Defendants had no reason to believe that Plaintiff could protect his own hearing in the Spartan disciplinary-style cell in which the Defendants had placed Plaintiff and restricted his property.

130. Plaintiff *et al.* promptly covered the windows in the doors to their SHU cells such that staffers making rounds could not see into the cells to visually confirm the immediate safety of the cells' inhabitants.

131. Such staffers were thus required to call a lieutenant to resolve the situation in order to conduct the required half-hourly safety checks of each cell's inhabitant.

132. A lieutenant arrived, turned off the "BIG ASS FAN" and opened the glass door to each cell's sally port, such that Plaintiff and the other prisoners in the hole could converse with the lieutenant.

133. Plaintiff *et al.* complained to the lieutenant about the noise from the "BIG ASS FAN."

134. Discovery and depositions will confirm that the lieutenant confirmed his personal knowledge of the noise problem with the "BIG ASS FAN" and stated his intent to raise the issue with Defendant DAN SPROUL.

135. The lieutenant then closed the cells' sally ports but refrained from turning back on the "BIG ASS FAN" before he left the hole.

136. Plaintiff at that time had begun to notice a ringing in his ears.

137. On the next half-hourly round Defendant UNKNOWN NAMED OFFICER OF THE U.S. BUREAU OF PRISONS turned back on maximum the "BIG ASS FAN."

138. Whenever the "BIG ASS FAN" was turned on, Plaintiff had difficulty or was unable to distinguish the ringing in his ears from the noise of the "BIG ASS FAN."

139. Within the next 48 hours Lieutenant Mr. Sweeney also came to the hole, re-opened the cells' sally ports and turned off the "BIG ASS FAN."

140. Discovery and depositions will confirm that Lieutenant Sweeney announced that he, Lieutenant Sweeney, had spoken with Defendant C. DAVIS, the captain in charge of custody.

141. Discovery and depositions will further confirm that Sweeney stated that Defendant KATHY HILL had broken the chain of command, bypassed custody staffers and went directly to Defendant DAN SPROUL to close the windows in the hole and install the "BIG ASS FAN" on maximum power.

142. Discovery and depositions will further confirm that Sweeney also stated that Defendant C. DAVIS had stated there was nothing within his, Defendant C. DAVIS's, power to do, and that he, Defendant C. DAVIS, had no discretion to stop the closure of the windows in the hole and the operation of the "BIG ASS FAN" on maximum power.

143. Discovery and depositions will further confirm that Sweeney stated he personally disagreed with closing the windows and leaving the "BIG ASS FAN" on maximum, and he found it highly inappropriate that Defendant KATHY HILL had circumvented his authority as the lieutenant in charge of the hole.

144. Discovery and depositions will further confirm that Sweeney promptly filed a complaint with the BOP's regional director against Defendants D. SPROUL and KATHY HILL for their operation of the "BIG ASS FAN" on maximum, closure of the windows in the hole and circumvention of the chain of command.

145. Discovery and depositions will further confirm that Sweeney then took early retirement about a week later.

146. When Sweeney left the hole he left the cells' sally ports open and the "BIG ASS FAN" powered off.

147. With the "BIG ASS FAN" powered off, Plaintiff again noticed the ringing in his ears.

148. But, again, on the next half-hourly round, Defendant UNKNOWN NAMED OFFICER OF THE U.S. BUREAU OF PRISONS turned the "BIG ASS FAN" back on maximum.

149. Plaintiff *et al.* continued to complain to Defendants at every or almost every round when staffers came to verify health and wellness.

150. Plaintiff complained to Defendants particularly about the ringing in his ears.

151. Plaintiff specifically advised medical staffers of the ringing in his ears, and they told Plaintiff the ringing in his ears would stop once he got away from the fans. Plaintiff disavows any claim against Defendant UNITED STATES OF AMERICA that would oblige Plaintiff to secure a "certificate of merit" under the Illinois Healing Arts Malpractice statute, 735 ILCS 5/2-622(a), and proceeds instead under the tort theories enumerated, *infra*, and any others that arise from a generous construction of Plaintiff's *pro se* pleadings. *See, e.g., Castro v. United States*, 540 U.S. 375, 381 (2003) (district court must warn unrepresented party before construing his pleading in a way that may deprive the unrepresented party of his rights).

152. Discovery and depositions will confirm that USP Marion I-unit prisoner Al-'Owhali wrote to his attorneys Ms. Kathy Manley, Esq., and Ms. Deborah Golden, Esq., from the hole, advising each of the extreme noise caused by Defendants' operation of the "BIG ASS FAN" on maximum power.

153. Discovery and depositions will further confirm that Manley and Golden each called USP Marion and spoke to, at minimum, I-unit Manager Defendant Mr. SHANNON WALLACE.

154. Discovery and depostions will further confirm that Defendant SHANNON WALLACE responded to Manley and Golden, materially and falsely assuring each that the windows were open in the hole when they were closed and that the "BIG ASS FAN" was off when it was in fact on maximum.

155. But, within a week of Al-'Owhali's letters to Manley and Golden, i.e. on June 15, 2021, C.O. Ms. Crouch of the USP Marion's safety department came to the hole with a decibel (dB) meter.

156. Crouch measured the noise level with the "BIG ASS FAN" on maximum at over 200 dB.

157. Crouch immediately had other staffers move the "BIG ASS FAN" approximately 50 ft. down the hall, away from Plaintiff's and others' occupied cells.

158. But Crouch also had staffers move another large, gray, commercial fan, measuring approximately 4 ft. in diameter, directly in front of Plaintiff's cell.

159. Crouch then had the large, gray fan turned on maximum power and measured the noise level of the new fan configuration at 157 dB.

160. Crouch then directed that the large, gray fan be turned to low power, which measured 87 dB, and left it that way, blowing directly into Plaintiff's cell. *Contrast* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 1600.11 National Occupational Safety and Health Policy at ch. 8(a) (June 1, 2017) (noise surveys are "to ensure that noise [...] adjacent to inmate sleeping areas does not exceed 70 dBA"); *id.* at ch. 8(e) (the environmental safety and compliance administrator "must conduct an institution-wide noise survey to identify any noise levels at or above the 85 decibel, 8-hour time weighted average (TWA) OSHA action level").

161. At the reduced-but-still-high 87-dB noise level, Plaintiff's ringing in his ears was pronounced and continuous, and it prevented him from sleeping.

162. Discovery and depositions will confirm that circa July 13, 2021, Defendant KATHY HILL's disciplinary charge against Plaintiff was adjudicated by a DHO, within earshot of Plaintiff.

163. Plaintiff's fellow prisoners verified their previous statements for the DHO, Exhs. 5–6.

164. Robinson then testified for the DHO as to Robinson's previous search of Plaintiff's former cell, USP Marion I-unit A-range no. 5, specifically as to his search of its lights, light fixtures and electrical receptacles with the appropriate tools.

165. Discovery and depositions will further confirm that Robinson assured the DHO that 1) he, Robinson, had already searched the lights, light fixtures and electrical receptacles of the cell in question, USP Marion I-unit A-range no. 5, but found nothing; 2) Plaintiff had never been allowed back to that cell after Robinson's search; 3) Defendant KATHY HILL had not checked-out any tools from the institution to search that cell days later; and 4) there was no possible way for Defendant KATHY HILL, without tools, to have disassembled the lights, light fixtures and electrical receptacles in that cell to have found the alleged contraband in the manner in which Defendant KATHY HILL wrote and signed in the charging document.

166. Last, Plaintiff spoke with the DHO, who had conducted the hearing by telephone.

167. Discovery and depositions will confirm that the DHO told Plaintiff that after the previous testimony the DHO needed no further statement from Plaintiff and found in Plaintiff's favor,

expunging Defendant KATHY HILL's charge against Plaintiff.

168. Shortly thereafter, Plaintiff began asking Defendant NATHAN SIMPKINS for an administrative-remedy informal-resolution form (hereinafter a "BP-8").

169. Discovery and depositions will confirm, however, that such forms were habitually unforthcoming from Defendants NATHAN SIMPKINS, KATHY HILL and SHANNON WALLACE throughout Plaintiff's incarceration at USP Marion's I-unit because those defendants had implemented an unofficial policy to curb the flow of administrative-remedy filings in the unit. *Contrast* U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement 1330.18 Administrative Remedy Program at ch. 7 (Jan. 6, 2014) ("The Warden[*sic*] is responsible for ensuring that effective informal resolution procedures are in place and that good faith attempts at informal resolution are made in an orderly and timely manner by both inmates and staff"). "These procedures may not operate to limit inmate access to formal filing of a [remedy] Request [('BP-9')]." *Id. See also Waugh v. Schreiber*, 2022 U.S. Dist. LEXIS 116208, No. 21-cv-813-JPG (S.D. Ill. June 30, 2022) at *4–5 (alleging Defendant NATHAN SIMPKINS "has repeatedly refused to provide Plaintiff and other inmates with BP-8, BP-9, BP-10, and BP-11 forms to enable them to file legitimate grievances," turning the remedy program into "a 'dead-end'").

170. And even after the DHO's favorable decision, the Defendants kept Plaintiff in disciplinary housing circa another week until July 22, 2021.

171. Discovery and depositions will confirm that during that time Plaintiff languished in the unsafe conditions in the hole because Defendant KATHY HILL had placed Plaintiff under a "threat assessment" for separation from Delgado, her informant.

172. Discovery and depositions will further confirm that Defendants arranged for Delgado's favorable transfer to a better prison, and that Defendants entered a formal separation order between Plaintiff and Delgado.

173. Discovery and depositions will further confirm that Defendants removed Plaintiff from the hole only when they were required to place Delgado in the hole for transfer because the newly entered separation order precluded Plaintiff's continued housing in the same area as Delgado's.

174. Once Plaintiff was released from the hole and removed from the fans, the ringing in his

ears continued in a more pronounced fashion absent the constant background noise.

175. The ringing continued to delay and interrupt Plaintiff's sleep.

176. Plaintiff advised USP Marion medical staffers that the ringing persisted after his removal from the fans.

177. Discovery and depositions will confirm that USP Marion medical staffers advised Plaintiff he likely had acquired tinnitus and they were unable to treat him.

178. Discovery and depositions will further confirm that Defendant KATHY HILL ordered Plaintiff upon his release from the hole into USP Marion I-unit A-range cell no. 13.

179. Discovery and depositions will further confirm that Defendant KATHY HILL, within hours of her ordering Plaintiff into I-unit A-range cell no. 13, ordered Plaintiff moved to I-unit D-range cell no. 1, i.e. up the stairs and as close as possible to the showers and other sources of noise and disturbance, e.g., the loud, often slammed door to the unit, the inmate telephone, treadmill and computers and the MP3-player-charging station.

180. Discovery and depositions will further confirm that a week later, circa August 5, 2021, Defendant KATHY HILL ordered Plaintiff moved again, to I-unit C-range no. 2, also near the showers and same sources of other noise.

181. In contrast to Plaintiff's experience, general-population prisoners generally have mandatory cell rotation every six months.

182. Plaintiff inquired directly with Defendant KATHY HILL as to the frequent cell moves.

183. Defendant KATHY HILL answered Plaintiff claiming that Defendant C. DAVIS had ordered her to rotate prisoners' cell assignments.

184. Plaintiff then directly inquired with Defendant C. DAVIS as to the frequent moves.

185. Defendant C. DAVIS answered Plaintiff by assuring Plaintiff that he, Defendant C. DAVIS, had nothing to do with Plaintiff's cell moves.

186. Discovery and depositions will show that at no relevant time did Defendant KATHY HILL rotate the cell assignments of more than Plaintiff and one other prisoner.

187. The day of the last cell move, August 5, 2021, Defendant NATHAN SIMPKINS belatedly gave Plaintiff the BP-8 that Plaintiff had been requesting since the DHO hearing circa July 13, 2021.

188. Plaintiff promptly executed his BP-8 within two calendar days, although Defendant NATHAN SIMPKINS was unavailable to accept back the BP-8 until circa August 11, 2021. *See* Remedy Series 1094018 As Ans., Circa Feb. 7, 2022, Exh. 9 at 25 ("Administrative Remedy—Informal Resolution") (Issued "8-5-21 N[ATHAN ]S[IMPKINS]"; "Received by Counselor from Inmate 8-11-21 N[ATHAN ]S[IMP-KINS]").

189. On August 12, 2021, Plaintiff reported Defendant KATHY HILL to the Justice Department's Office of the Inspector General ("OIG"). *See* Letter to OIG, Exh. 10.

190. Discovery and depositions will confirm that as IRO, Defendant KATHY HILL read Plaintiff's report to the OIG against her. *See* CMU P.S. at ch. 5(c)(1) ("Only privileged communication with the inmate's attorney will be handled as special mail") (citing 28 C.F.R. § 540.203).

191. Circa that same time and continuing ever after, Defendant KATHY HILL consistently took adverse actions and omissions against Plaintiff.

192. Plaintiff, for instance, tried to place four of his twice-weekly scheduled phone calls that month, in August 2021, but the inmate telephone system (ITS) refused to allow Plaintiff to place his calls.

193. Each time this happened, Plaintiff showed the on-duty officers the unit's telephone roster, which showed Plaintiff had properly signed-up for his calls.

194. Discovery and depositions will confirm that each time the officer called Defendant KATHY HILL and explained to her that Plaintiff was unable to make his call.

195. Discovery and depositions will further confirm that each time Defendant KATHY HILL claimed she had entered every other USP Marion I-unit prisoner's call into the system except Plaintiff's.

196. Discovery and depositions will further confirm that Defendant KATHY HILL withheld Plaintiff's mail and periodicals for weeks at a time.

197. Discovery and depositions will further confirm that USP Marion Education Director Ms. Owens tried to hire Plaintiff for a desirable job inside the prison, but that Defendant KATHY HILL emailed Ms. Owens to order Owens not to hire Plaintiff.

198. Discovery and despositions will further confirm that Plaintiff later spoke directly with

Ms. Owens, who told Plaintiff that she, Ms. Owens, knew not why Defendant KATHY HILL refused to allow Ms. Owens to hire Plaintiff.

199. Circa August 17, 2021, Defendant NATHAN SIMPKINS purported to have "Rejected" Plaintiff's BP-8 "due to being untimely." Remedy Series 1094018 As Ans., Exh. 9 at 25 ("Administrative Remedy—Informal Resolution"), at § 4 ("Rejected due to being untimely").

200. Plaintiff promptly filed a formal administrative-remedy request ("BP-9"). See Remedy Series 1094018 As Ans., Exh. 9 at 24 (U.S. Dep't of Justice, Fed. Bureau of Prisons, Form BP-229(13), Request for Administrative Remedy) ("24 Aug 2021") (Plaintiff "Requested remedy forms from Case Manager N. Simpkins on 26 July + 30 July 2021 but did not receive the forms until Aug 5th 2021, making this timely") (complaining against Delgado and Defendant KATHY HILL).

201. On August 30, 2021, i.e. within days of Plaintiff's remedy filing, Defendant KATHY HILL again ordered Plaintiff moved, to USP Marion I-unit C-range cell no. 13.

202. The next day, August 31, 2021, Plaintiff complained, again, in writing about Defendant KATHY HILL's 1) frequent orders to change his cell, 2) negligent omissions to enter his phone calls into the system and 3) foreclosure of his work opportunity with Ms. Owens: "This behavior is a blatant abuse of her [Defendant KATHY HILL's] authority and retaliation on her part for [my] filing a complaint against her." Cop-out As Subm., August 31, 2021, Exh. 11.

203. Plaintiff sent the aforesaid complaint electronically then also handed paper copies to 1) Defendant C. DAVIS, 2) Defendant DAN SPROUL, 3) Defendant SHANNON WALLACE and 4) USP Marion's then-Special Investative Agent (S.I.A.) in charge of S.I.S.

204. Discovery and depositions will confirm that Defendant KATHY HILL read the aforesaid complaint before it was approved for delivery electronically.

205. For approximately the next 45 days Defendants seemed voluntarily to cease their adverse acts and omissions against Plaintiff.

206. Plaintiff, however, continued the administrative-remedy process.

207. Meanwhile Defendants KATHY HILL and DARNELL W. MOON, aka QAMAR ED-DEEN ABDUL LATIF, a jailhouse cooperator, had been colluding to eliminate prisoners who filed against Defendant KATHY HILL, as discovery and depositions will establish.

208. Discovery and depositions will further show that by October 4, 2021, at least seven such prisoners who had filed against Defendant KATHY HILL had been thrown in the hole when Defendant DARNELL W. MOON filed false complaints against each under the Prison Rape Elimination Act (PREA), 34 U.S.C. §§ 30301 *et seq.*, 28 C.F.R. Part 115.

209. Discovery and depositions will further show that Defendant DARNELL W. MOON habitually touted such PREA complaints around the unit soliciting cosignatories.

210. Discovery and depositions will further show that in every such instance investigators other than Defendant KATHY HILL found Defendant DARNELL W. MOON's PREA complaint to be unsubstantiated.

211. Discovery and depositions will further show, however, that Defendant KATHY HILL waylaid each exonerated prisoner in the hole under a so-called "threat assessment" and solicited from Defendant DARNELL W. MOON a written statement that he, Defendant DARNELL W. MOON, felt threatened by the exonerated prisoner.

212. Discovery and depositions will further show that Defendant KATHY HILL used each such statement by Defendant DARNELL W. MOON as the supposed basis to enter a formal separation order between the exonerated prisoner and Defendant DARNELL W. MOON.

213. Discovery and depositions will further show that Defendant KATHY HILL used each such separation order to transfer the exonerated prisoner, always or usually to a less desirable prison.

214. On September 17, 2021, while Defendants KATHY HILL and DARNELL W. MOON carried-on said conspiracy, Defendant NATHAN SIMPKINS delivered to Plaintiff the response to Plaintiff's BP-9. *See* Remedy Series 1094018 As Ans., Exh. 9 at 23 (Rejection Notice—Administrative Remedy, Sept. 13, 2021).

215. Still undeterred, Plaintiff promptly filed a regional administrative-remedy appeal ("BP-10"). *Id.* at 21 (U.S. Dep't of Justice, Fed. Bureau of Prisons, Form BP-230(13), Regional Administrative Remedy Appeal) ("28 Sept. 2021") ("When [Plaintiff] was released [from the hole] he repeat[ed]ly requested BP forms to address this issue but did not receive them until Aug 5 2021").

216. Plaintiff included in that same envelope a Standard Form 95 ("SF-95"), Exh. 12.

217. Discovery and depositions will confirm that Plaintiff had never spoken directly to Defen-

dant DARNELL W. MOON when, circa 2:00 P.M. Central Time, October 5, 2021, officers locked-down the USP-Marion I-unit CMU, restrained Plaintiff and threw him in the hole, once again into, effectively disciplinary housing.

218. Discovery and depositions will further confirm that shortly thereafter Lieutenant Mr. Henderson came to the hole and advised Plaintiff that Defendant DARNELL W. MOON had filed a PREA complaint against Plaintiff, which had caused Plaintiff to be thrown in the hole.

219. Discovery and depositions will further confirm that Henderson completed interviews that same day, including of Plaintiff, to investigate Defendant DARNELL W. MOON's complaint against Plaintiff.

220. Circa October 6, 2021, Defendant NATHAN SIMPKINS delivered to Plaintiff the first response to Plaintiff's BP-10. See Remedy Series 1094018 As Ans., Exh. 9 at 22 (Rejection Notice—Administrative Remedy, Oct. 6, 2021).

221. The regional office also returned Plaintiff's SF-95, unacknowledged, along with his BP-10.

222. Plaintiff spoke directly with Defendant NATHAN SIMPKINS about the timeliness of Plaintiff's remedy filings.

223. Discovery and depositions will show that Defendant NATHAN SIMPKINS offered to write a timeliness memorandum ("timel. memo.") and include it with Plaintiff's resubmission of his BP-10.

224. Plaintiff also re-mailed his SF-95 to regional, this time in a separate envelope.

225. The next day, October 7, 2021, Henderson, having reviewed the facts, witnesses and other evidence, determined that Defendant DARNELL W. MOON's PREA complaint against Plaintiff was unfounded.

226. Discovery and depositions will show that, having found Defendant DARNEL W. MOON's PREA complaint against Plaintiff unfounded, Henderson recommended Plaintiff's release from the hole.

227. But discovery and depositions will further show that Defendant KATHY HILL secured from Defendant DARNELL W. MOON a written statement claiming that Defendant DARNELL W. MOON felt threatened by Plaintiff.

228. Discovery and depositions will further show that Defendant KATHY HILL knew or should have

known Defendant DARNELL W. MOON's statements against Plaintiff were false and part of Defendant's continued and well-established habit of such false allegations, but that Defendant KATHY HILL nonetheless used Defendant DARNELL W. MOON's statements against Plaintiff to keep Plaintiff in the hole under a "threat assessment."

229. Discovery and despositions will further confirm that Defendant DARNELL W. MOON again touted his PREA complaint, this time against Plaintiff, throughout USP Marion I-unit's entire population, seeking cosignatories, and that dozens of other prisoners repeated the allegations to Plaintiff through the windows, which, that time, absent Delgado, remained open and unobstructed.

230. Discovery and depositions will further confirm that Defendant DARNELL W. MOON also touted a civil complaint he had composed against Plaintiff and another USP Marion I-unit prisoner whom Defendant DARNELL W. MOON had also wrongly waylaid into the hole.

231. Discovery and depositions will further confirm that Defendant DARNELL W. MOON's principal allegation against Plaintiff in both the PREA and civil complaints was that Plaintiff had, supposedely, solicited oral sex from Defendant DARNELL W. MOON.

232. Discovery and depositions will further confirm that Defendant DARNELL W. MOON's principal allegations against the other USP Marion I-unit prisoners and staff whom Defendant DARNELL W. MOON falsely accused were materially indistinguishable from his allegations against Plaintiff.

233. To be clear, Defendant DARNELL W. MOON's allegations against Plaintiff in both the PREA and civil complaints are entirely false.

234. Discovery and depositions will further confirm that later on October 7, 2021, a male prison psychologist came to the hole to speak to a prisoner similarly situated to Plaintiff, also held under threat assessment after Defendant DARNELL W. MOON's PREA complaint against him too had been investigated and determined to be unfounded.

235. Plaintiff could not help but hear the conversation between the psychologist and the other prisoner and note the striking similarities to his own situation, i.e. that he too was waylaid in the hole after Defendant DARNELL W. MOON's false complaint against him had already been found unsubstantiated.

236. Thus Plaintiff interjected and the psychologist later assessed Plaintiff's mental state.

237. Discovery and depositions will show that during Plaintiff's assessment, which directly followed the assessment of the aforesaid other similarly situated prisoner, Plaintiff was visibly and obviously upset by Defendant DARNELL W. MOON's allegation that Plaintiff had solicited oral sex from Defendant DARNELL W. MOON because, e.g., the paper trail from such an allegation is, in general population in the U.S. penitentiaries for which Plaintiff is classified, grounds for summary beating and death.

238. Discovery and depositions will further show that Plaintiff, during the assessment, was also very disturbed emotionally by the situation with Defendant KATHY HILL, e.g., that Plaintiff had no control of or timely recourse against Defendant KATHY HILL's abuse of her position to keep Plaintiff in the hole, away from communications with his family as he coped with the untimely loss of his daughter and logistics for four of his grandchildren.

239. Discovery and depositions will further show that Plaintiff, during the assessment, was emotionally fearful of further retaliation by Defendant KATHY HILL, who, Plaintiff had reasonably concluded, wielded unchecked power in the USP Marion I-unit CMU.

240. Discovery and depostions will further show that the psychologist concluded his assessment of Plaintiff by determining that Plaintiff was at immediate risk of self-harm.

241. Discovery and depositions will further confirm that the psychologist immediately placed Plaintiff on suicide watch elsewhere in the prison.

242. Discovery and depositions will further confirm that after clearing suicide watch Plaintiff remained on suicide monitoring for a further six days, but he remained in the hole.

243. And with Plaintiff in the hole, Defendant DARNELL W. MOON frivolously sued Plaintiff in the Circuit Court for the First Judicial Circuit in Williamson County, Illinois. *See Darnell W. Moon v. James Gary*, Case No. 21-L-136 (Oct. 21, 2021).[1]

---

[1] Defendant DARNELL W. MOON also "is well known to this Court because he has been subject to a filing restriction since 2016." *Moon v. United States*, 2020 U.S. Dist. LEXIS 192680. No. 20-cv-653-JPG (S.D. Ill. Oct. 19, 2020) at *4 (citing *Moon v. Dodrill*, 2016 U.S. Dist. LEXIS 202657, No. 15-cv-876-MJR-SCW (S.D. Ill. May 13, 2016)). Defendant DARNELL W. MOON "was originally sanctioned for committing fraud in connection with his application for leave to proceed *in forma pauperis*." *Id.* (citing same). "When asked to disclose his litigation history," Defendant DARNELL W. MOON "omitted sixty (60) cases filed during his incarceration between 2008 and 2014 and more than three 'strikes' under 28 U.S.C. § 1915(g)." *Id.* (footnote omitted collecting cases). "The Court found that" Defendant DARNELL W. MOON's "omissions were material, intentional, and fraudulent and enter-

244. Plaintiff was well aware of Defendant DARNELL W. MOON's history as a vexacious litigant, and answered Defendant DARNELL W. MOON's Complaint, moved to dismiss for failure to state a claim and actual innocence, challenged Defendant DARNELL W. MOON's IFP status and filed a counterclaim. *See Darnell W. Moon v. James Gary* (entered Dec. 6, 2021).

245. Discovery and depositions will show that later in December 2021 Defendant KATHY HILL took a two-week vacation, with Plaintiff still in the hole and Defendant DARNELL W. MOON's misconduct yet-unchecked.

246. Discovery and depositions will further show that on the second day of Defendant KATHY HILL's vacation, Defendant DARNELL W. MOON threatened to have yet another prisoner illegitimately transferred, but that Defendant DARNELL W. MOON was unaware at that time that Defendant NATHAN SIMPKINS was around the corner overhearing his threat.

247. Discovery and depositions will further confirm that by then the situation in USP Marion's I-unit CMU was such that the other prisoners commonly called Defendant DARNELL W. MOON "the warden of the CMU" due to his influence over Defendant KATHY HILL and his exercise of power through her by proxy.

248. Discovery and depositions will further confirm that the BOP's line staffers working in I-unit by then had also grown fearful of Defendant DARNELL W. MOON's predictable retaliation through Defendant KATHY HILL.

249. But when Case Manager Defendant NATHAN SIMPKINS heard Defendant DARNELL W. MOON's express threat to have yet another USP Marion I-unit CMU prisoner wrongly transferred under false pretenses, Defendant NATHAN SIMPKINS confronted Defendant DARNELL W. MOON.

250. Depositions and discovery will confirm that Defendant DARNELL W. MOON responded by directly threatening Defendant NATHAN SIMPKINS.

251. Discovery and depositions will further confirm that, in Defendant KATHY HILL's absence, Defendant NATHAN SIMPKINS promptly had Defendant DARNELL W. MOON placed in the hole and designated

ed an Order prohibiting him from 'filing any further litigation in this Court until he pays all outstanding fees.'" *Id.* at \*3–4 (quoting *Dodrill* at \*6) (emphasis in *Moon v. United States*) (footnote omitted). "At the time the filing restriction was imposed," Defendant DARNELL W. MOON "owed more than $2,900.00 in unpaid filing fees." *Id.* at \*4 (footnote omitted) (collecting cases of unpaid filing fees).

for transfer.

252. Discovery and depositions will further confirm that on December 16, 2021, Defendant NATH- AN SIMPKINS delivered to Plaintiff the response to his resubmitted BP-10. *See* Remedy Series 1094018 As Ans., Exh. 9 at 20 (Rejection Notice–Administrative Remedy, Nov. 10, 2021).

253. Discovery and depositions will further confirm that Defendant NATHAN SIMPKINS's timel. memo. had been removed from the remedy as it was returned to Plaintiff. *Id.*

254. Discovery and depositions will further confirm that Defendant NATHAN SIMPKINS agreed to write and include another timel. memo. with Plaintiff's final remedy appeal, which Plaintiff promptly completed on December 21, 2021, and submitted for mailing. *Id.* at 2 (U.S. Dep't of Jus- tice, Fed. Bureau of Prisons, Form BP-231(13) ("BP-11"), Central Office Administrative Remedy Ap- peal) ("21 Dec 2021") ("After the first untimely response I had Case Manager Simpkins add a letter explaining the Remedy was not untimely"). ("Virtually all Remedies at CMU are declared untimely").

255. Plaintiff concurrently mailed part of the aforesaid remedy appeal to the OIG:

> [T]his Complaint outlines conduct by the Intillegence Research Specialist (IRS) Ms. Kathy Hill.
>    To include:
> 1) L[y]ing to the FBI
> 2) Selling of drugs in the institution
> 3) Sexual relations with an inmate
> 4) Introduction of contraband, i.e. cell phones, drugs
> 5) retaliation
> 6) vindictive conduct used to cover her activities

Complaint to OIG, Exh. 9 at 7.

256. As the USP Marion I-unit CMU's intelligence officer, Defendant KATHY HILL, again, read Plaintiff's OIG Complaint and his remedy appeal, *supra*, ¶ 190 (citation omitted), but not until she returned from vacation.

257. Discovery and depositions will show that during Defendant KATHY HILL's vacation Plain- tiff's mailings to the OIG and the central office were processed from USP Marion in a timely man- ner.

258. Upon Defendant KATHY HILL's return from vacation she went to the hole to speak with Def- endant DARNELL W. MOON within earshot of Plaintiff.

259. Plaintiff thus heard Defendant KATHY HILL tell Defendant DARNELL W. MOON that she had

tried to cancel Defendant DARNELL W. MOON's transfer but there was "nothing I can do."

260. Within a month of Defendant DARNELL W. MOON's threatening of Defendant NATHAN SIMPKINS, Defendant DARNELL W. MOON was transferred to USP Canaan.

261. At some point after Defendant KATHY HILL's return from vacation, Plaintiff mailed a copy of his latest OIG Complaint, *supra*, ¶ 255, to the BOP's Internal Affairs department, at which point, if not earlier, Defendant KATHY HILL read the complaint, *supra*, ¶¶ 190 (citation omitted), 256.

262. Discovery and depositions will confirm that, either just before DARNELL W. MOON's transfer, or just after it, Defendant KATHY HILL solicited USP Marion I-unit CMU prisoner Dustin Adams to file notice that he, Adams, felt threatened by Plaintiff.

263. Discovery and depositions will further confirm that Defendant KATHY HILL used Adams's statement to keep Plaintiff in the hole under another "threat assessment" and, ultimately, arrange Plaintiff's transfer to the Federal Correctional Institution (FCI) Terre Haute, Indiana's D-unit CMU.

264. Discovery and depositions will further confirm that just about every element of the FCI Terre Haute D-unit CMU is less desirable and more punitive than the USP Marion I-unit CMU, *e.g.*, the commissary selection and availability is poorer at the FCI Terre Haute D-unit CMU, its communications restrictions are more intense and more harshly enforced, there are one third as many televisions and they are impossible to watch from the cells, the day has less out-of-cell time, the food was of poorer quality, the cells are more cramped and the drinking and bathing water is so poor that, unlike at Marion, FCI Terre Haute sells—and its population buys in considerable volume—canned water.

265. Discovery and depositions will further confirm that neither Defendant KATHY HILL nor anyone else ever provided Plaintiff with documentation purporting to justify his continued discilinary housing after Defendant DARNELL W. MOON's transfer.

266. Sometime before January 21, 2022, Plaintiff mailed to be entered in *Darnell W. Moon v. James Gary* a Motion to Sanction Defendant DARNELL W. MOON, alleging that Defendant DARNELL W. MOON had falsified his application to proceed *in forma pauperis*.

267. On January 21, 2022, Plaintiff was transferred from USP Marion's I-unit CMU to FCI Terre Haute D-unit CMU.

268. The same day Plaintiff's sanctions motion against Defendant DARNELL W. MOON was entered in *Darnell W. Moon v. James Gary*. *See* Docket Report.

269. A few days into Plaintiff's stay at FCI Terre Haute's D-unit CMU, he was seen for medical intake by Dr. Elizabeth Trueblood.

270. Plaintiff complained to Trueblood about the ringing in his ears and his still-worsening hearing loss.

271. Plaintiff was deferred to another medical expert at FCI Terre Haute.

272. Ten days into Plaintiff's stay at FCI Terre Haute, the state court gave Defendant DARNELL W. MOON "10 DAYS TO RESPOND UNDER OATH WITH A CURRENT PRINTOUT OF BALANCES IN ALL ACCOUNTS HELD ANYWHERE IN WHICH" he, Defendant DARNELL W. MOON, "HAS AN OWNERSHIP INTEREST." *See* Docket Report, *Darnell W. Moon v. James Gary*, January 31, 2022.

273. Circa February 7, 2022, Plaintiff received the response to his final remedy appeal. *See* Remedy Series 1094018 As Ans., Exh. 9 at 1 (Rejection Notice—Administrative Remedy).

274. On February 16, 2022, the state court noted: "NO RESPONSE TO MOTION FOR SANCTIONS OR COM-PLIANCE WITH COURT'S SHOW CAUSE DATED 1/31/22." *See* Docket Report, *Darnell W. Moon v. James Gary*. "THE COURT FINDS THAT" Defendant DARNELL W. MOON "DID NOT MAKE FULL DISCLOSURES OF HIS ASSETS." *Id.* "COURT VACATES ITS GRANT OF WAIVER OF COURT FEES." *Id.* Defendant DARNELL W. MOON "GIVEN 45 DAYS TO PAY THE FILING FEE." *Id.*

275. At some point thereafter, Defendant DARNELL W. MOON moved to dismiss *Darnell W. Moon v. James Gary*. Plaintiff received no service of said motion from Defendant DARNELL W. MOON despite Plaintiff's having updated his own address of record in the case.

276. On March 1, 2022, the state court, "IN ITS DISCRETION," granted Defendant DARNELL W. MOON's "MOTION FOR VOLUNTARY DISMISSAL." *See* Docket Report. "CASE DISMISSED. CLOSE FILE." *Id.*

277. Circa that same week, Plaintiff saw the other medical expert at FCI Terre Haute, reported his hearing loss was still worsening and was referred for outside diagnosis and care.

278. On April 27, 2022, Plaintiff was evaluated by attending physician Pollyanna Sumansky and

audiologist M. Shaw at Union Medical Group Audiology in Terre Haute. *See* OP-Otolaryngol Nursing/Ancillary Notes, Exh. 1.

279. Plaintiff was diagnosed with "mild to moderate sensorineural hearing loss" in his left ear and tinnitus. *Id.*

280. All the doctors could do was recommend "using background noise to try and mask the ringing noise." *Id.*

281. Plaintiff came to understand from the outside doctors, and discovery and depositions will confirm, that Plaintiff's tinnitus is permanent and his hearing loss and tinnitus were caused by prolonged exposure to loud noise.

282. Plaintiff's only such prolonged exposure to loud noise without adequate hearing protection was in the hole at the USP Marion I-unit CMU; thus Plaintiff's hearing loss and tinnitus were caused by Defendants' operation of the "BIG ASS FAN" and other fans in close proximity to Plaintiff's cell for weeks on end while Defendants also denied Plaintiff hearing protection, in violation of common sense and Defendants' own health-and-safety policies.

283. Shortly after Plaintiff's audiology appointment, Plaintiff received Defendant UNITED STATES OF AMERICA's denial of his SF-95. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Right-to-sue Letter re Claim Number TRT-NCR-2022-01601, Exh. 13.

284. Plaintiff then timely commenced this action Friday, February 10, 2023, under the prison-mailbox rule by filing this Complaint and JURY DEMAND. *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court"); *Houston v. Lack*, 487 U.S. 266 (1988) (establishing the prison-mailbox rule); Proof of Mailing, Exh. 14.

*Plaintiff Requests a Pavey Hearing.*

285. Plaintiff incorporates and realleges by reference paragraphs 1 through 284 as if restated in full.

286. Plaintiff expressly notes that "exhaustion is not required when the prison officials responsible for providing grievance forms refuse to give a prisoner the forms necessary to file an administrative grievance." *Gooch v. Young*, 24 F.4th 624, ___ (7th Cir. 2022) (citing *Hill v. Snyder*, 817 F.3d 1037, 1041 (7th Cir. 2016)).

287. Here, like in *Gooch* and *Hill*, Plaintiff requested remedy forms from the correct official, but was constructively denied those remedy forms, *supra*, ¶¶ 168–69, 187–88, 199–200, 214–16, 220–23, 252–54, 273.

288. Plaintiff still made every attempt to have his BP-8, -9, -10 and -11 heard. *Id.*

289. Therefore, should Defendants contest exhaustion or the Court be left with any questions any questions as to exhaustion, Plaintiff requests an evidentiary hearing and limited discovery. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008) (Posner, J.) (recognizing a prisoner's "failure to exhaust" may be "innocent (as when prison officials prevent a prisoner from exhausting his remedies)" and requiring evidentiary hearings and discovery to resolve contested exhaustion defenses). *See also Ross v. Blake*, 587 U.S. 632, 644 (2016) ("exhaustion is not required [...] when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

290. At the required hearing Plaintiff will call a bevy of witnesses with specific knowledge of the the situation, *e.g.*, Defendant NATHAN SIMPKINS and the prisoners who overheard Plaintiff's numerous requests for remedy forms, as well as those familiar with the effective general policy of minimizing remedy filings in the USP Marion I-unit CMU, such as other current and former USP Marion I-unit CMU prisoners who face and faced the same issue.

### Count I — Premisis Liability

291. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 as if restated in full.

292. Defendant UNITED STATES OF AMERICA and its employees Defendants KATHY HILL, DAN SPROUL, C. DAVIS, J. LECLAIR, NATHAN SIMPKINS, SHANNON WALLACE, C.O. MR. HOWELL, C.O. MR. COOK and others whose names are to be established by discovery and at trial, of the U.S. Bureau of Prisons (BOP), a federal agency of the UNITED STATES OF AMERICA, at all relevant times had a duty to make and maintain USP Marion in a reasonably safe condition for habitation and use by the persons residing there, including Plaintiff. *See, e.g., Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017) (citing *Ward v. K Mart Corp.*, 136 Ill. 2d 132 (1990); *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006)).

293. All acts and omissions herein complained-of were performed by employees of Defendant UNITED STATES OF AMERICA in the scope of their employment or line of duty, and with Defendant UNITED STATES OF AMERICA's permission and consent.

294. This claim is brought pursuant to 28 U.S.C. §§ 2671 *et seq.*

295. From June 4, 2021, until circa July 22, 2021, Defendant's employees were negligent in that they created and perpetuated an unreasonable risk of harm to Plaintiff, i.e. the operation of the "BIG ASS FAN" and other fans at noise levels over 200 dB, then over 87 dB, directly outside Plaintiff's solitary-confinement cell. *Parker*, 845 F.3d at 811 (citing *Jordan v. National Steel Corp.*, 701 N.E.2d 1092, 1094 (Ill. 1998); *Mueller v. Phar-Mor, Inc.*, 784 N.E.2d 226, 231 (Ill. App. Ct. 2000)) (iterating elements of premisis liability).

296. During said time Defendant's employees knew or should have known that said risk was unreasonable because it was in direct violation of Defendant's own health and safety policies governing noise levels and hearing protection and plain old common sense. *Cf. id.*

297. During said time Defendant's employees anticipated or should have anticipated Plaintiff's failure to protect himself because they failed to provide Plaintiff hearing protection, even after Plaintiff expressly asked them for such, and they also prevented Plaintiff, by segregating him to solitary confinement, from volitionally leaving the area or acquiring hearing protection through any other possible avenue. *Cf. id.*

298. During said time, in addition to the negligent nature of the entire situation, Defendant's employees breached their duties to Plaintiff specifically under statute to "provide suitable quarters and provide for" Plaintiff's "safekeeping, care, and subsistence," as well as for Plaintiff's "protection." 18 U.S.C. § 4042(a)(2)(3); *Parker*, 845 F.3d at 811 (citing *Jordan*, 701 N.E.2d at 1094; *Mueller*, 784 N.E.2d at 231) (requiring a negligent act for premisis liability). This negligent act injured Plaintiff as detailed below.

299. During said time Plaintiff suffered permanent hearing loss and acquired permanent tinnitus, each condition now confirmed by licensed medical professionals. *Cf. id.*

300. Defendant's employee's aforesaid acts and omissions caused Plaintiff's injuries as demonstrated by Plaintiff's personal and family medical histories otherwise free from such problems.

Cf. id.

301. As a direct result of Plaintiff's injuries Plaintiff is partially disabled for life and requires continued medical care to mitigate further injury and hearing loss and cope with the tinnitus that has never and will never stop.

WHEREFORE, Plaintiff demands judgment against Defendant UNITED STATES OF AMERICA for compensatory damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel. *See Sprinkle v. Colvin*, 777 F.3d 421, 423 (7th Cir. 2015) (attorney's fee rate of $125 per hour may be adjusted for increased costs of living).

## Count II — Negligence

302. Plaintiff incorportaes and reallages by reference paragraphs 1 through 301 as if restated in full.

303. From June 4 through July 22, 2021, and at prior and subsequent times, Defendant UNITED STATES OF AMERICA and its employees Defendants KATHY HILL, DAN SPROUL, C. DAVIS, J. LECLAIR, NATHAN SIMPKINS, SHANNON WALLACE, C.O. MR. HOWELL, C.O. MR. COOK and others whose names are to be established by discovery and at trial, of the U.S. Bureau of Prisons (BOP), a federal agency of the UNITED STATES OF AMERICA, owed Plaintiff a duty of care to "provide suitable quarters and provide for" Plaintiff's "safekeeping, care, and subsistence," as well as for Plainitff's "protection." 18 U.S.C. § 4042(a)(2), (3). *See Buechal v. United States*, 746 F.3d 753, 763–64 (7th Cir. 2014) (citing *Thompson v. Gordon*, 948 N.E.2d 39, 45 (Ill. 2011)) (iterating elements of negligence).

304. Defendant's employees breached that duty when they operated the "BIG ASS FAN" and other fans directly outside Plaintiff's solitary-confinement cell at noise levels of 200 dB, then 87 dB without providing Plaintiff hearing protection. Cf. id.

305. Said breach proximately caused Plaintiff's injuries, i.e. permanent hearing loss and tinnitus, as demonstrated by Plaintiff's personal and family medical histories otherwise free of such problems. Cf. id.

306. As a direct result of Plaintiff's injuries Plaintiff is partially disabled for life and requires continued medical care to mitigate further injury and hearing loss and cope with the

tinnitus that has never and will never stop.

WHEREFORE, Plaintiff demands judgment against Defendant UNITED STATES OF AMERICA for compensatory damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel. *See, again, Sprinkle*, 777 F.3d at 423.

### Count III—Abuse of Process—Federal Defendant

307. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 as if restated in full.

308. All acts and omissions herein complained-of were performed by employees of Defendant UNITED STATES OF AMERICA in the scope of their employment or line of duty, and with Defendant UNITED STATES OF AMERICA's permission and consent.

309. This claim is brought pursuant to 28 U.S.C. §§ 2671 *et seq.*

310. The federal-prison discipline-process is judicial in scope and effect. *See, e.g., Edwards v. Balisok*, 520 U.S. 641, 644 (1997) (prison-disciplinary convictions are convictions under *Heck v. Humphrey*, 512 U.S. 477 (1994)). A search through the Lexis folio for the U.S. Court of Appeals for the Seventh Circuit, for example, yields 181 results for *"disciplinary conviction*"*. And in Plaintiff's particular case, Defendant UNITED STATES OF AMERICA sought to use the prison-discipline process to lengthen Plaintiff's confinement to the maximum amount allowed by law, as discovery shall show.

311. Defendant UNITED STATES OF AMERICA's employees Defendant KATHY HILL and others whose names are to be established by discovery and at trial, of the U.S. Bureau of Prisons (BOP), a federal agency of the UNITED STATES OF AMERICA, had ulterior purposes or motives in invoking the federal-prison disciplinary process against Plaintiff, *e.g.*, to secure a sentence reduction for favored career informant Ruben Delgado on the basis of his substantial cooperation in bringing a federal criminal case against Plaintiff for a bogus crime and retaliation against Plaintiff's prior successful expungements of criminal-level charges at USP Thomson and Plaintiff's complaints against Defendant KATHY HILL. *See Vaughn v. Chapman*, 662 F. App'x 464, 467–68 (7th Cir. 2016) (citing *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 929 (Ill. App. Ct. 2004))

(iterating elements of abuse of process).

312. The same employee's or employees' acts in the use of the federal-prison disciplinary process were improper in the regular course of proceedings, e.g., the planting of the drugs to falsely implicate Plaintiff and the omission from the charging document of Defendant KATHY HILL's knowledge that the drugs had been planted by a party other than Plaintiff and that Plaintiff had not in fact been assigned to USP Marion I-unit A-range cell no. 5 for some time, after which multiple other prisoners had unsupervised access to that same cell. Cf. id. See also, e.g., Disc. P.S. at ch. 2 ("The description of the incident" in the charging document "should contain all facts known by the" charging "employee that are not confidential") and Principles ("c. Staff control inmate behavior in an impartial and consistent manner"; "d. Disciplinary action may not be capricious or retaliatory").

WHEREFORE, Plaintiff demands judgment against Defendant UNITED STATES OF AMERICA for compensatory damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel. See, again, Sprinkle, 777 F.3d at 423.

## Count IV—Malicious Prosecution—Federal Defendant

313. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 and 308 through 312 as if restated in full.

314. The same employees commenced then continued the original disciplinary proceeding against Plaintiff. See Lund v. City of Rockford, 956 F.3d 938, 949 (7th Cir. 2020) (quoting Swick v. Liautaud, 662 N.E.2d 1238, 1242 (Ill. 1996)) (iterating elements of malicious prosecution); Susinka v. Trujillo, 2022 U.S. Dist. LEXIS 227885, No. 21-cv-1837-PAB-MEH (D. Colo. Dec. 19, 2022) at *29–30 (recommending a plaintiff's malicious prosecution claim proceed for false prison incident report).

315. The proceeding terminated in Plaintiff's favor, i.e. the incident report was completely expunged.

316. The charging employees at all times lacked probable cause for the disciplinary proceeding, having conspired in the planting of the drugs, lied about Plaintiff's cell assignment and

withheld material exculpatory information and evidence from the charging document, i.e. the planting of the drugs by a career informant. *Cf. Lund*, 956 F.3d at 940.

317. The charging employees' malice in prosecuting Plaintiff is manifest from the very circumstances of the prosecution itself, as well as Defendant KATHY HILL's other retaliatory actions and omissions against Plaintiff, *e.g.*, blocking Plaintiff's mother based on acquitted conduct, omitting to enter Plaintiff's phone calls into the system, frequently forcing him to move to undesirable cells and ordering the windows shut in an already sweltering hotbox then ordering placement of noisemaking equipment at unsafe decibel levels. *Cf. id.*

318. The charging employees' malicious prosecution resulted in damages to Plaintiff including his hearing loss and tinnitus and severe emotional distress facing potential criminal prosecution for a crime he knew he did not commit at the same time he was struggling to cope with the loss of his daughter and provide for four of his grandchildren.

WHEREFORE, Plaintiff demands judgment against Defendant UNITED STATES OF AMERICA for compensatory damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel. *See, again, Sprinkle*, 777 F.3d at 423.

### Count V — Intentional Infliction of Emotional Distress — Federal Defendant

319. Plaintiff incorporates and realleges by reference paragraphs 1 through 318 as if restated in full.

319. The aforesaid conduct was truly extreme and outrageous, *e.g.*, trying to frame an innocent man in retaliation for his protected conduct to benefit a career informant and locking that same man in a Spartan solitary-confinement cell without ear protection for weeks on end with dangerous noise exceeding 200 dB then 87 dB directly outside his cell in direct violation of health-and-safety policies such that he could never sleep and incurred permanent hearing loss and tinnitus. *See Richards v. United States Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)) (iterating elements of the intentional infliction of emotional distress); *Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) (Posner, J.) (allowing nomi-

nal damages for emotional injury absent physical injury under the PLRA).

320. Through said conduct Defendant UNITED STATES OF AMERICA's employees intended to inflict severe emotional injury on Plaintiff or knew there was at least a high probability that their conduct would cause Plaintiff severe emotional distress because, as pleaded, Defendant's own health-and-safety and discipline policies precluded their conduct, and plain common sense also manifested a practical certainty of severe emotional injury to Plaintiff, which Defendant's employees expressly recognized in their comments to Plaintiff about various employees' obvious hatred for Plaintiff after deployment of the "BIG ASS FAN." *Cf. Richards*, 869 F.3d at 566.

321. And said conduct in fact caused Plaintiff severe emotional distress as evidenced by his placement on suicide watch, complaints to medical staffers about the ringing in his ears and complaints to custody staffers about the noise and wrongful invocation of the disciplinary process at a time he was coping with the loss of his daughter and trying to provide for four of his grandchildren. *Cf. id.*

322. Plaintiff moreover suffered an actual physical injury to his hearing from Defendant's said employees' same conduct.

WHEREFORE, Plaintiff demands judgment against Defendant UNITED STATES OF AMERICA for compensatory and nominal damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel. *See, again, Sprinkle*, 777 F.3d at 423.

### Count VI—Negligent Infliction of Emotional Distress—Federal Defendant

323. Plaintiff incorporates and realleges by reference paragraphs 1 through 318 as if restated in full.

324. Defendant's employees' aforesaid conduct made Plaintiff both a bystander- and direct-impact-victim of negligent infliction of emotional distress. *See, e.g., Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) (citations omitted) (iterating direct-impact and bystander NIED).

325. The same dangerous situation with the "BIG ASS FAN" and other fans that physically in-

jured Plaintiff with hearing loss and tinnitus caused him emotional distress as evidenced by his complaints to medical staffers about the ringing in his ears and complaints to custody staffers about the noise and wrongful invocation of the disciplinary process when he was coping with the loss of his daughter and trying to provide for four of his grandchildren.

326. As a direct-impact victim, Plaintiff may recover for a purely emotional injury. *Lewis*, 561 F.3d at 703 (citing *Corgan v. Muehling*, 574 N.E.2d 602, 609 (Ill. 1991)) ("Direct victims no longer need to suffer physical manifestations resulting from the emotional distress as a prerequisite to recovery; emotional injuries alone will suffice").

327. And as a bystander, the situations with the fans and false PREA report placed Plaintiff in a zone of danger of severe physical harm from other prisoners due to the obscene  nature of the PREA allegations and of self-harm as evinced by Plaintiff's placement on suicide watch then suicide monitoring.

WHEREFORE, Plaintiff demands judgment against Defendant UNITED STATES OF AMERICA for compensatory and nominal damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel. *See, again, Sprinkle*, 777 F.3d at 423.

## Count VII—Cruel and Unusual Punishments

328. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 as if restated in full.

329. The aforesaid conduct of Defendants KATHY HILL, DAN SPROUL, C. DAVIS, J. LECLAIR, NATHAN SIMPKINS, SHANNON WALLACE, C.O. MR. HOWELL, C.O. MR. COOK and UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS violated Plaintiff's right to be free from cruel and unusual punishments under U.S. Const. amend. VIII, resulting directly in his permanent hearing loss and tinnitus and extreme mental anguish, that said Defendants knew or should have known was exacerbated by his loss of his daughter and frustrated attempts to provide for four of his grandchildren.

WHEREFORE, Plaintiff demands trial by jury of said Defendants and entry of judgment against them for nominal, compensatory and punitive damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by

counsel. *See, again, Sprinkle,* 777 F.3d at 423.

*Count VIII—Abuse of Process—Defendant DARNELL W. MOON*

330. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 as if restated in full.

331. Defendant DARNELL W. MOON had ulterior purposes and motives in filing his frivolous, voluntarily dismissed lawsuit against Plaintiff under false pretenses, including Defendant's deliberate falsification of his application to proceed *in forma pauperis. See Vaughn,* 622 F. App'x at 467.

332. Defendant DARNELL W. MOON's ulterior purposes and motives included his collaboration with Defendant KATHY HILL to vex, harass and initimidate Plaintiff to deter Plaintiff's lawful conduct and secure Plaintiff's transfer to a less-desirable prison under false pretenses.

333. This conduct is entirely consistent with Defendant DARNELL W. MOON's known pattern of filing meritless litigation to intimidate, harass and vex other litigants in retaliation for their lawful conduct.

334. Defendant DARNELL W. MOON's acts in the use of process were improper in the regular course of proceedings, *e.g.,* touring his false and frivolous claims around USP Marion I-unit to subject Plaintiff to physical danger from other prisoners and help secure Plaintiff's wrongful transfer to a less desirable prison, all while abusing the proceedings not to redress legitimate grievances but to vex, harass and intimidate Plaintiff and deter Plaintiff's lawful conduct. *Cf. id.*

WHEREFORE, Plaintiff demands trial by jury of Defendant DARNELL W. MOON and entry of judgment against him for nominal, compensatory and punitive damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel.

*Count IX—Malicious Prosecution—Defendant DARNELL W. MOON*

335. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 and 331 through 334 as if restated in full.

336. Defendant DARNELL W. MOON commenced the aforecited case *Darnell W. Moon v. James Gary.*

337. That case was favorably terminated for Plaintiff when the state court revoked Defendant

DARNELL W. MOON's IFP status upon Plaintiff's Motion for Sanctions and the court's finding that Defendant DARNELL W. MOON had materially falsified his affidavit of indigency, leading to voluntary dismissal. Cf. Lund, 956 F.3d at 949 (citation omitted).

338. As detailed in Plaintiff's answer to Defendant DARNELL W. MOON's complaint and Motion to Dismiss, Defendant DARNELL W. MOON never had probable cause for the case, as further evidenced by Defendant DARNELL W. MOON's failure to state a claim and failure to assert that Plaintiff's allegedly defamatory remarks were in any way untrue or misleading. Cf. id.

339. Defendant DARNELL W. MOON's malice in filing the suit is manifest by Defendant DARNELL W. MOON's obvoius umbrage to Plaintiff's true statements and Defendant DARNELL W. MOON's pattern of conduct as a litigant who uses the courts not for redress but to harass, intimidate and vex those he dislikes. Cf. id.

340. Defendant DARNELL W. MOON's lawsuit caused Plaintiff to incur costs to defend himself publicly from Defendant DARNELL W. MOON's frivolous allegations, e.g., postage, typing supplies, photocopy fees, paper and envelopes, as well as emotional anguish from Defendant DARNELL W. MOON's false allegation in the lawsuit that Plaintiff had supposedly been more than the fifth person to solicit DARNELL W. MOON. Cf. id.

WHEREFORE, Plaintiff demands trial by jury of Defendant DARNELL W. MOON and entry of judgment against him for nominal, compensatory and punitive damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel.

*Count X—Intentional Infliction of Emotional Distress—Defendant DARNELL W. MOON*

341. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 and 331 through 340 as if restated in full.

342. Defendant DARNELL W. MOON's aforesaid conduct was truly extreme and outrageous, e.g., falsely claiming and reporting to authorities that Plaintiff had solicited oral sex from Defendant DARNELL W. MOON with the intent or knowledge that the false claim would result in Plaintiff's solitary confinement and transfer to a less desirable prison, then filing a frivolous lawsuit against

Plaintiff echoing the same false claim while also misleading the court as to Defendant DARNELL W. MOON's inability to pay filing fees, all while also aware that the nature of Defendant DARNELL W. MOON's obscene,   false allegations presented and continue to present a very real danger of beatings and homicide to Plaintiff in the penitentiaries that Defendant DARNELL W. MOON knew or should have known to be Plaintiff's customary prison milieu. Cf. *Richards*, 869 F.3d at 566.

343. Defendant DARNELL W. MOON clearly intended thus to inflict severe emotional distress upon Plaintiff or knew there was a high probabilty that his conduct would cause Plaintiff severe emotional distress, as evidenced by Defendant DARNELL W. MOON's pattern of such conduct against a line of victims each exonerated, culminating in Defendant DARNELL W. MOON's express threat to yet another victim that Defendant DARNELL W. MOON would misuse the PREA-reporting process against him too, and only stopped when prison authorities overheard then pre-empted that threat. Cf. *id.*

344. Defendant DARNELL W. MOON's said conduct did in fact cause Plaintiff severe emotional distress, as evidenced by Plaintiff's placement on suicide watch then suicide monitoring when Defendant DARNELL W. MOON's said conduct caused, *e.g.*, Plaintiff to be thrown in the hole, confronted by numerous third parties with Defendant DARNELL W. MOON's false and obscene allegation while that same allegation prevented Plaintiff, by placing him in solitary confinement, from providing for four of his grandchildren in the wake of his daughter's untimely death.

WHEREFORE, Plaintiff demands trial by jury of Defendant DARNELL W. MOON and entry of judgment against him for nominal, compensatory and punitive damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel.

*Count XI — Negligent Infliction of Emotional Distress — Defendant DARNELL W. MOON*

345. Plaintiff incorporates and realleges by reference paragraphs 1 through 290 and 331 through 340 as if restated in full.

346. Defendant DARNELL W. MOON's aforesaid conduct made Plaintiff a bystander victim of negligent infliction of emotional distress by placing Plaintiff in the zone of danger of beatings or homicide at the hands of other prisoners due to the obscene and false nature of Defendant DARNELL

W. MOON's allegations and of self-harm, as evidenced by Plaintiff's placement on suicide watch and them suicide monitoring.

WHEREFORE, Plaintiff demands trial by jury of Defendant DARNELL W. MOON and entry of judgment against him for nominal, compensatory and punitive damages, interest, fees, costs and any other relief that the Court finds proper, including attorneys' fees should Plaintiff later be represented by counsel.

## Prayer

ACCORDINGLY, Plaintiff seeks this Court's judgment against the defendants:

A. In the sum of $1,400,000.00 against Defendant UNITED STATES OF AMERICA;

B. In the sum of $5,000,000.00 against Defendant KATHY HILL;

C. In the sum of $5,000,000.00 against Defendant DAN SPROUL;

D. In the sum of $1,000,000.00 against Defendant C. DAVIS;

E. In the sum of $1,000,000.00 against Defendant J. LECLAIR;

F. In the sum of $1 against Defendant NATHAN SIMPKINS;

G. In the sum of $500,000.00 against Defendant SHANNON WALLACE;

H. In the sum of $10,000.00 against Defendant C.O. MR. HOWELL;

I. In the sum of $10,000.00 against Defendant C.O. MR. COOK;

J. In the sum of $10,000.00 against each of the UNKNOWN NAMED OFFICERS OF THE U.S. BUREAU OF PRISONS;

K. In the sum of $4,000,151.00 against Defendant DARNELL W. MOON;

L. In a sum to be determined against the Defendants jointly and severally for Plainitff's costs of suit;

M. In a sum to be determined against the Defendants jointly and severally for Plaintiff's attorney fees;

N. For pre- and postjudgment interest as allowed by law; and

O. Any other relief that the Court deems proper.

## Verification

I, Plaintiff JAMES L. GARY, verify that the foregoing is true and correct under the penalty of perjury under the laws of The United States of America. *See* 28 U.S.C. § 1746. Executed Friday, February 10, 2023,

by: *James L. Gary*

James L. Gary, *pro se*
Reg. no. 09112-045
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN 47808